FILED
CLERK, U.S. DISTRICT COURT

JUL - 5 2017

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 17 CR00401 |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 371: Conspiracy] |
| CHARLES KLASKY, | **[UNDER SEAL]** |
| Defendant. | |

The Acting United States Attorney charges:

[18 U.S.C. § 371]

A.    INTRODUCTORY ALLEGATIONS

At all times relevant to this Information:

Lap-Band Surgery and Bariatric Coverage

1.    Lap-Band surgery (also known as bariatric surgery) was an elective weight-loss procedure that employed the Lap-Band, a restricted device, regulated by the United States Food and Drug Administration.

2.    Lap-Band surgery was intended for use only in morbidly obese adult patients who met specific criteria based on their body mass index ("BMI"), had failed more conservative weight-reduction

1    alternatives, and committed to making various permanent changes in
2    their eating habits.
3        3.    If a patient had bariatric coverage through their
4    insurance, the insurance company typically required that the Lap-Band
5    surgery be pre-approved before providers could bill and obtain
6    payment for the surgery and related pre-operative and post-operative
7    services and procedures.  Patients with bariatric coverage would
8    generally be pre-approved and the Lap-Band surgery deemed medically
9    necessary if, among other requirements, they either had a BMI of 40
10   or more, or a BMI of 35 or more and at least one co-morbidity, such
11   as obstructive sleep apnea ("OSA"), typically diagnosed through a
12   sleep study.
13       4.    In order to obtain pre-approval for Lap-Band surgery, the
14   medical provider would have typically submitted a pre-authorization
15   request (also known as a letter of medical necessity or "LOMN") that
16   established the medical necessity for the Lap-Band procedure with
17   documentation showing that the patient was morbidly obese and met all
18   the additional qualifications of the particular plan, including
19   documentation of any co-morbidity.
20       5.    If an insurance company knew that a LOMN and/or attached
21   supporting documentation contained false or fraudulent statements
22   purporting to support the medical necessity for the Lap-Band
23   procedure, it would not cover any claims submitted for the Lap-Band
24   and related services for that patient.
25       Sleep Studies
26       6.    A polysomnography ("PSG") was a baseline sleep study
27   ordered by a licensed physician based on an individualized assessment
28

                                    2

1    of a patient's risk for a sleep disorder.  A PSG was typically billed

2    to insurance under common procedural terminology ("CPT") code 95810.

3        7.    If, based on the PSG results, the licensed physician

4    interpreting the PSG diagnosed the patient with OSA and prescribed

5    treatment using a continuous positive airway pressure ("CPAP")

6    machine, a titration study, also known as a "CPAP" study, could have

7    been conducted to find the appropriate pressure for use in treating

8    the OSA using the CPAP.  The titration study was billed to insurance

9    under CPT code 95811.

10       8.    Sleep studies such as PSGs and titration studies generated

11   raw data that was typically scored by a Registered Polysomnographic

12   Sleep Technician ("RPSGT").  As part of that scoring, the RPSGT

13   calculated the apnea-hypopnea index ("AHI"), a score related to the

14   number of breathing cessations (apneas) and drops in the breathing

15   rate accompanied by oxygen desaturation (hypopneas) that occurred in

16   the study.  An AHI of less than 5 was normal, while an AHI between 5

17   and 14.9 reflected mild OSA, between 15 and 29.9 reflected moderate

18   OSA, and 30 or higher reflected severe OSA.

19       9.    The sleep study would then be interpreted by a qualified

20   licensed physician, who would have used the sleep study results to

21   arrive at diagnoses and treatment recommendations specific to the

22   patient's results.

23       10.   Most insurance companies require a diagnosis of moderate or

24   severe OSA to qualify as a co-morbidity that would support a request

25   for Lap-Band pre-approval.

26       GET THIN and the GET THIN Sleep Study Program

27       11.   "GET THIN" referred to a network of entities — including

28   Independent Medical Services, Inc. ("IMS"); Surgery Center

Management, LLC ("SCM"); and Medical Payment Processing, LLC ("MPP"), among others — that worked to promote, perform, and submit insurance claims for Lap-Band surgeries and other medical procedures, including sleep studies, in the Central District of California, and elsewhere, between at least in or around 2008 and at least in or around June 2016.

12. GET THIN was controlled by Co-Conspirator 1 ("CC-1") and others, who: (a) set and reviewed GET THIN's policies and procedures, including policies and procedures with respect to the services GET THIN would provide, the billing for those services, and materials submitted to insurance companies; (b) reviewed individual patient files and claims for services submitted to insurance carriers; and (c) approved GET THIN expenses.

13. Beginning in or around January 2010 and continuing to at least in or around December 2015, GET THIN maintained a sleep study program ("SSP") to conduct sleep studies for patients who came to GET THIN seeking Lap-Band surgery.

14. Between in or around May 2010 and in or around December 2015, defendant CHARLES KLASKY ("KLASKY"), who was not a licensed medical professional, was the manager of the SSP.

15. The SSP conducted both PSG and titration studies in multiple locations in California, including locations in Apple Valley, Long Beach, Palmdale, San Bernardino, and West Hills, all in the Central District of California.

16. The SSP employed a Registered Polysomnographic Sleep Technician ("RPSGT"), to score manually the raw data from the sleep study tests.

1    17.   The SSP also employed a "Sleep Specialist," Co-Conspirator

2    2 ("CC-2"), who was a licensed physician, to review and interpret the

3    scored sleep studies.

4    18.   The SSP also paid Co-Conspirator 3 ("CC-3"), who was not a

5    medical professional and who was employed by GET THIN in its

6    nutrition department, to assist defendant KLASKY in altering or

7    "formatting" the sleep study reports ("SSRs").

8    B.   OBJECT OF THE CONSPIRACY

9    19.   Between in or around May 2010 and in or around December

10   2015, in Los Angeles County, within the Central District of

11   California, and elsewhere, defendant KLASKY, CC-1, CC-2, CC-3, and

12   others known and unknown to the Acting United States Attorney,

13   knowingly combined, conspired, and agreed to commit health care

14   fraud, in violation of Title 18, United States Code, Section 1347.

15   C.   MANNER AND MEANS OF THE CONSPIRACY

16   20.   The object of the conspiracy was carried out, and to be

17   carried out, in substance, as follows:

18        a.   According to GET THIN policies set by CC-1 and others,

19   GET THIN employees would routinely schedule patients for one or more

20   sleep studies, irrespective of medical need, in an effort to uncover

21   a co-morbidity that would assist GET THIN in obtaining insurance

22   approval for Lap-Band surgery from various health care benefit

23   programs.

24        b.   After the sleep studies had been conducted and scored

25   by an RPSGT, at defendant KLASKY's direction, the RPSGT would input

26   those scores into a SSR template created by defendant KLASKY that

27   included the electronic signature of CC-2 and standardized diagnoses

28   and treatment options that were not individualized to the patient.

1        c.    Acting at CC-1's direction and knowing that CC-2 would
2    either not review the SSR or would review it without reference to the
3    raw data from the sleep study, defendant KLASKY would then alter, or
4    instruct others including CC-3 to alter, the sleep study results in
5    the SSR, falsifying the AHI and other test data in them to make it
6    appear as though the patients had OSA when they, in fact, did not, or
7    to make it appear as though they had more severe OSA than they, in
8    fact, had.

9        d.    Defendant KLASKY falsified other aspects of the SSRs
10   as well — including a patient's weight and score on the Epworth
11   Sleepiness Scale, a test designed to evaluate a patient's risk for
12   daytime sleepiness and sleep apnea — in order to make the patients
13   more likely to receive insurance pre-approval for Lap-Band surgery.

14       e.    Defendant KLASKY falsified the SSRs, knowing and
15   intending that (i) those falsified SSRs would be provided to
16   insurance companies — often attached to an LOMN that also referenced
17   the falsified sleep study results — as part of GET THIN's request for
18   pre-authorization for Lap-Band surgery and (ii) the insurance
19   companies would rely on the falsified SSRs and corresponding
20   inaccurate LOMN statements regarding the sleep study results in
21   making decisions regarding Lap-Band pre-approval.

22       f.    As defendant KLASKY well knew, once insurance pre-
23   approvals were obtained, based in part on the fraudulent information
24   in the SSRs altered by defendant KLASKY and others acting at his and
25   CC-1's direction, GET THIN would perform Lap-Band surgery on the
26   patients, submit claims for services associated with that Lap-Band
27   surgery, and receive payment from insurance companies for those
28   claims.

1    g.   Defendant KLASKY would seek approval from CC-1 for

2  payments to individuals instrumental in committing this fraud,

3  including CC-2 and CC-3.  In particular, defendant KLASKY would

4  authorize and seek CC-1's approval for payments to CC-3 for

5  fabricating SSRs.  Defendant KLASKY would also authorize and seek CC-

6  1's approval for payments to CC-2, which, although ostensibly for CC-

7  2's review and interpretation of sleep studies, were intended by

8  defendant KLASKY and CC-1 to ensure CC-2's continued participation in

9  the conspiracy, including CC-2's permission to use his electronic

10 signature on SSRs he did not review or interpret.

11    21.  GET THIN billed insurance companies and health care benefit

12 programs at least approximately $159,637,716 for Lap-Band surgeries

13 for patients for whom SSRs had been falsified to reflect that the

14 patients suffered from OSA or more severe OSA than the patients, in

15 fact, had.  Insurance companies and health care benefit programs paid

16 at least approximately $17,895,974 on those claims.

17 D.   OVERT ACTS

18    22.  On or about the following dates, in furtherance of the

19 conspiracy and to accomplish its object, defendant KLASKY, together

20 with CC-1, CC-2, CC-3, and others known and unknown to the Acting

21 United States Attorney, committed and willfully caused to be

22 committed, the following overt acts, among others, in the Central

23 District of California and elsewhere:

24    Overt Act No. 1:   On or about March 18, 2012, defendant KLASKY

25 approved an invoice authorizing payment of $570 to CC-3 for "pre-

26 formatting," that is, fabricating, approximately 57 SSRs.

27    Overt Act No. 2:   Between on or about April 14, 2012, and on

28 or about January 23, 2014, CC-1 caused GET THIN to submit

approximately $169,814 in claims to Blue Cross Blue Shield for services related to a Lap-Band surgery performed on or about March 22, 2012 on K.H., for whom, on or about February 22, 2012, defendant KLASKY falsified or caused to be falsified an SSR, increasing the AHI score contained in that SSR from 2.2 (normal) to 21.2 (moderate OSA).

  Overt Act No. 3:   On or about October 5, 2012, based on CC-1's authorization, defendant KLASKY sought payment to CC-2 in the amount of $9,550.

  Overt Act No. 4:   Between on or about May 16, 2012, and on or about February 6, 2013, CC-1 caused GET THIN to submit approximately $144,655 in claims to UnitedHealthcare for services related to Lap-Band surgery performed on or about November 14, 2011 on P.M., for whom, on or about June 2, 2011, defendant KLASKY falsified or caused to be falsified an SSR, increasing the AHI score contained in the SSR from 21.7 (moderate OSA) to 32.1 (severe OSA).

SANDRA R. BROWN
Acting United States Attorney


LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

GEORGE S. CARDONA
Assistant United States Attorney
Chief, Major Frauds Section

KRISTEN A. WILLIAMS
KIMBERLY D. JAIMEZ
Assistant United States Attorneys
Major Frauds Section